In re Jeremy Ralph MOODY, Debtor.

### SOUTHTRUST BANK OF ALABAMA, Plaintiff,

v.

### Jeremy Ralph MOODY, Defendant.

**Bankruptcy No. 96–3316–8P7. Adversary No. 96–672.**

United States Bankruptcy Court, M.D. Florida, Tampa Division.

Dec. 5, 1996.

John G. Bianco, Tampa, FL, for Plaintiff.

Brent A. Rose, St. Petersburg, FL, for Defendant.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND MEMORANDUM OPINION

ALEXANDER L. PASKAY, Chief Judge.

The matter under consideration in this Chapter 7 case is a challenge of the dischargeability of a credit card debt owed by Jeremy Ralph Moody (Debtor) to Southtrust Bank of Alabama (Bank). The Bank, in its Complaint, alleges that the Debtor was indebted, and still is, to the Bank in the amount of $3,884.75. The Bank alleges that the debt is based on the Debtor's use of a Mastercard credit card issued by the Bank, and that the charges, when incurred, were incurred by the Debtor with the full intent not to repay the Bank or with the knowledge that he had no ability to meet the obligations incurred. The Bank contends that the debt should be excepted from the overall protection of the general bankruptcy discharge pursuant to § 523(a)(2)(A).

In due course, the Debtor filed an Answer entitled "Response to the Complaint" (sic) which contains some general admissions. In addition, the Answer also contains a pleading described as "Affirmative Defenses," which are not really affirmative defenses according to the Federal Rules of Civil Procedure Rule 8(c), but basically are a denial that he intended to defraud the Bank. The Answer includes statements that the Bank failed to state a cause of action for which relief can be granted, apparently intending to be a Motion to Dismiss. In due course, the matter was set for final evidentiary hearing, at which time the following facts were established by stipulation of the parties:

At the relevant time, the Debtor had in his possession the credit card issued by the Bank. The record does not reveal the payment history prior to October 1, 1995, at which time the balance was $0.00. However, it is without dispute that between November 10, 1995, and January 16, 1996, the Debtor obtained five cash advances totalling $2,600.00, and purchased goods totalling $1,284.75 through the use of the credit card issued by the Bank.

It is without dispute that the Debtor is a single person having no dependents, and dur-

ing the relevant period, two years before the commencement of the bankruptcy case, he was employed either on a part or full-time basis as a paramedic. In addition, in the tax year of 1994, the Debtor had a gross taxable income of $31,525.94, and in the tax year ending December 31, 1995, the Debtor had a gross taxable income of $23,199.00, indicating a drop in income of approximately $9,000.00 a year. Moreover, it appears from his Schedule I filed with his Petition, indicating income and expenses, that he had a negative disposable income of $154.00 a month. It further appears from his Schedule of Liabilities that the Debtor had the use of eight credit cards, and on the date of the commencement of this case he had a total outstanding unsecured debt attributable to credit cards in the amount of $38,764.14. There is no evidence in this record to indicate the minimum payment required to service the balance on these credit cards during the relevant time.

The facts indicate that the Debtor, after terminating his employment with the office of a doctor, decided to enroll in a nursing school hoping to achieve an RN degree within approximately 1 year. Although he was also employed by Life–Fleet Sun Star, a paramedic service which operated under a subcontract with the County of Pinellas, his income fluctuated according to the number of hours he worked, and his rate of pay was between $10.00 and $12.00 per hour.

The Debtor first contacted an attorney for the purpose of seeking relief in the Bankruptcy Court on January 19, 1996. After that date, no charges or cash advances have been made by the Debtor pursuant to the instructions of his attorney and, furthermore, no payments have been made. The last charge appears to have been made on January 1, 1996. It was a cash advance and, according to the Debtor, was made to pay off one credit card balance with a high interest rate by a credit card with a lower interest rate.

Basically, these are the underlying relevant facts on which the Bank contends it is entitled to a declaration that the debt owed by the Debtor to the Bank should be excepted from the discharge pursuant to § 523(a)(2)(A). Section 523(a)(2)(A) in relevant provides:

> (a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt
>
> > (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained, by—
> >
> > > (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition.

It is well established that the party who seeks a determination of nondischargeability bears the burden of proof. The burden of proof is no longer the clear and convincing standard, but merely the preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991). To establish a viable claim under § 523(a)(2)(A), there must be competent proof of the following: (1) that the Debtor obtained money, property, services or an extension of credit from the creditor as a result of a false representation, other than a statement respecting the Debtor's financial condition, with the purpose and intention of deceiving the creditor; (2) that the creditor relied on such representation; (3) that the creditor's reliance was justifiable; and (4) that the creditor sustained a loss as a result of his justifiable reliance on the debtor's representation. *Field v. Mans*, — U.S. ——, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995); *Grogan v. Garner, supra; In re Vann*, 67 F.3d 277, 281 fn. 5 (11th Cir.1995); *St. Laurent II v. Ambrose*, 991 F.2d 672, 680 (11th Cir.1993); *In re Hunter*, 780 F.2d 1577 (11th Cir.1986).

The application of § 523(a)(2)(A) to credit card debts received an extensive treatment recently by the Ninth Circuit in the case of *In re Anastas*, 94 F.3d 1280 (9th Cir.1996). In *Anastas*, the B.A.P. affirmed the decision of the Bankruptcy Court which was based on the fact that the Debtor did not have the ability to service or pay back all of the debt he incurred in his gambling activities. The Court concluded that the Debtor lacked the intent to repay the debts at the time he incurred them. According to the Bankruptcy

Court, this finding satisfied the actual fraud requirement of § 523(a)(2)(A) citing as authority, *In re Dougherty,* 84 B.R. 653 (9th Cir. B.A.P.1988) at 1284. Particularly, the Bankruptcy Court relied on *In re Eashai,* 167 B.R. 181 (9th Cir. B.A.P.1994), which was affirmed by the 9th Circuit in *In re Eashai,* 87 F.3d 1082 (9th Cir.1996) which approved the B.A.P.'s general approach to non-dischargeability of credit card debts.

In *Eashai,* the Ninth Circuit Court identified two separate points in the relationship between the card issuer and the card holder. According to the Court, the first point deals with when the time the card is issued, because no one can dispute that when the card holder accepts the card he or she impliedly represents that he or she has the intention to pay the charges incurred. The second point deals with when the card holder forms the intent not to repay the debt which he is incurring. *Id.,* 94 F.3d at 1284. According to *Eashai,* at that point the card holder has "the duty to disclose his new state of mind of his intent to no longer repay the credit card debt." The *Anastas* Court noted that *Eashai* involved a kiting scheme by the Debtor pursuant to which the Debtor obtained cash advances on one card in order to make the minimum payments on the other cards and then did the reverse and paid Peter by robbing Paul. However, according to the Court, in a typical credit card case the inquiry is not whether the card holder lacked the intent to repay *all* of the charges made because of a fraudulent financial scheme. Rather, the inquiry is whether the card holder lacked the intent to repay when making certain *individual* charges because he planned to discharge the charges in bankruptcy. This is commonly referred to as the card holder engaging in "loading up." *Id.* at 1285. In the case of "loading up," the Court views each individual transaction as a unilateral contract between the card issuer and the card holder. The Court concluded that the central inquiry in determining whether there is a fraudulent representation is whether the card holder lacked the intent to repay the particular charge when it was made. Based on the forgoing, the Court concluded that the representation made by the card holder was not

that he had the *ability* to repay the debt but whether he had the *intention to repay.*

It would indeed be a journey into fantasy land to seriously accept the proposition that a credit card holder will ever discharge this so-called duty and inform the credit card issuer that he no longer intends to pay for the charges he will incur thereafter. Notwithstanding all of this, the Court concluded that the focus of the inquiry should not be on the hopeless insolvency of the Debtor at the time the charges were made, but whether the Debtor maliciously and in bad faith incurred credit card debts with the intention to discharge the charges in bankruptcy. *Id.* at 1286.

This Court is constrained to reject this overly narrow approach to deal with the application of the exception to discharge set forth in § 523(a)(2)(A) to credit card debts. To limit the exception to instances where the credit card holder engaged in a fraudulent scheme of "kiting" as in *Eashai,* or where the card holder was "loading up" after already deciding to file bankruptcy is, in this Court's view, a totally unrealistic position. This is so because it does not extend the applicability of the exception to instances where the card holder made charges by using the card when he or she knew, or should have known, that he or she had no ability to repay the debt or had no realistic expectations to be able to repay the debts in the foreseeable future.

This scenario is not uncommon and can be best illustrated by the case of *In re Dorsey,* 120 B.R. 592 (Bankr.M.D.Fla.1990). In this case the Debtor, a widow with two teenage daughters and an income of $480.00 from Social Security, had not been gainfully employed since 1978. Although she claimed to have received substantial support from a mysterious boyfriend, this support was quite questionable since she did not even know the boyfriend's full name or his address. She ran up in excess of $106,000.00 in credit card debt on an extended European vacation visiting every country in West Central Europe, with a side trip to Greece. Upon her return to the States, and after a short rest, she took an additional trip up North and charged, of course, all expenses for the trip on credit cards. *Id.* at 594. It should not take a

rocket scientist to figure out that even if Ms. Dorsey lived 1000 years she would still not be able to repay the charges she ran up on her credit cards. This Court had no difficulty concluding that the monies owed to the card issuer was within the exception set for in § 523(a)(2)(A).

Clearly under this scenario, the Debtor's ability to repay the charges incurred was a significant factor and had to be considered even if the Debtor did not engage in a "fraudulent financial scheme," as in *Anastas*, or in a pre-bankruptcy plan of "loading up." The reckless abuse of the privilege to use was sufficient to except the charges from the discharge pursuant to § 523(a)(2)(A). This Court does not dispute that a mere inability to meet the minimum charge on the card, or the balance exceeding the credit card limit, alone would not be sufficient to except the debt under § 523(a)(2)(A), but certainly it is taken into account on a case by case basis and depends on the facts of the particular situation involved.

For instance, in the case of *In re Hinshaw*, 199 B.R. 786 (Bankr.M.D.Fla.1995), the Debtor, who was a land developer on a large scale, basically met his personal and business expenses by using several credit cards and when closing a transaction, paid off all balances and then stated over again. Everything was running without a hitch until a proposed large project fell through and the Banks refused to extend further financing of the land development business. *Id.* at 789. In this particular case, it was reasonably to infer that when the Debtor made the charges, which all remained outstanding, he had a reasonable expectation, based on past experience, that he would be able to meet the obligations and pay the charges incurred. *Id.* at 790.

Applying the foregoing principles to the facts under consideration, this Court is satisfied that there is no evidence in this record which warrants the finding that this Debtor engaged in a fraudulent financial scheme or of "loading up" having already decided to seek relief in the Bankruptcy Court. This leaves for consideration the question of whether this Debtor either knew or had reason to believe that he would not be able to meet his obligations to the creditor card issuer.

Having considered the entire record, this Court is satisfied that this record equally supports both the defense of the Debtor, that he had the intention to meet his obligation to pay the minimum payment required of the contract, and the proposition urged by the Plaintiff, that the debtor knew or had reason to believe that he was unable to meet the charges made on the card issued by the Plaintiff. This being the case, since the evidence is in equilibrium, the Plaintiff failed to carry its burden to establish the claim of non-dischargeability by a preponderance of the evidence. For the reasons stated, the claim of non-dischargeability based on § 523(a)(2)(A) cannot be sustained. A separate final judgment will be entered in accordance with the foregoing.

DONE AND ORDERED.