DENNIS, Circuit Judge, specially
concurring:
I agree with Judge Duhe’s conclusion that AT&T failed to prove that Mercer’s debt is not dischargeable under section 523(a)(2). I also agree with much of his opinion. I concur specially because, in my opinion: (1) when a debtor uses a credit card, he or she impliedly promises to repay the loan; but (2) a credit card company cannot justifiably rely upon every card user’s representation simply because the card was used; therefore, (3) a creditor who issues credit cards without a reasonably adequate assessment of each debtor’s credit history and present financial condition cannot claim that mere use of any such card constitutes a justifiably relied upon representation to pay; however, (4) such a creditor may, through a period of good experience with the debtor, acquire a basis for believing that the debtor’s mere use of the card is such a representation upon which the creditor may justifiably rely.
To demonstrate that a debt is not dis-chargeable as fraudulent under section 523(a)(2), a creditor must prove by a preponderance of the evidence that (1) the debtor made false representations; (2) at the time they were made the debtor knew they were false; (3) the debtor made the representations with the intention and purpose to deceive the creditor; (4) the creditor actually and justifiably relied on such representations; and (5) the representations proximately caused the debtor to obtain money and the creditor to sustain losses. See RecoverEdge L.P. v. Pentecost, 44 F.3d 1284, 1292 (5th Cir.1995) (as modified by Field v. Mans, 516 U.S. 59, 69, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995)).
*219 I agree with the Ninth Circuit that “[e]aeh time a ‘card holder uses his credit card, he makes a representation that he intends to repay the debt.’ ” American Express Travel Related Services Company, Inc. v. Hashemi (In re Hashemi), 104 F.3d 1122, 1126 (9th Cir.1997) (quoting Anastas v. American Savings Bank (In re Anastas), 94 F.3d 1280, 1285 (9th Cir.1996)). Thus, Mercer clearly made representations of her intent to repay when she used the credit card to obtain cash advances. However, to prevail under section 523(a)(2), a creditor must prove all of the essential elements of fraud. See RecoverEdge, 44 F.3d at 1292. Proof of an implied representation of the debtor’s intent to repay by the use of the card does not satisfy the creditor’s burden to establish any of the other elements of fraud, including the debtor’s knowledge of falsity and intent to deceive, the creditor’s actual and justifiable reliance upon the representation, and the causal link between the representation and the debtor’s obtainment of money.
Because the bankruptcy court held that Mercer did not make any implied representations, it did not address the falsity and intent elements. Regardless of whether the implied representations were knowingly false and made with the intent to deceive, however, AT&T failed to prove that Mercer’s debt was excepted from discharge under section 523(a)(2) because, under the undisputed facts AT&T did not justifiably rely on the representations to repay loans implied by Mercer’s use of the credit card. The Supreme Court has held that, for a debt to qualify for the exception to discharge under section 523(a)(2), the creditor must prove that he actually and justifiably relied on knowingly false representations made by the debtor for the purpose of deception. See Field, 516 U.S. at 70, 116 S.Ct. 437. The requirement that reliance be justifiable is to insure that such reliance is actual. As the Court stated:
As for the reasonableness of reliance, our reading of the Act does not leave reasonableness irrelevant, for the greater the distance between the reliance claimed and the limits of the reasonable, the greater the doubt about reliance in fact. Naifs may recover, at common law and in bankruptcy, but lots of creditors are not at all naive. The subjectiveness of justifiability cuts both ways, and reasonableness goes to the probability of actual reliance.
Field, 516 U.S. at 76, 116 S.Ct. 437. Professors Keeton and Prosser (cited with approval by the Court in Field) discuss the justifiable reliance factor similarly, stating:
The other side of the shield is that one who has special knowledge, experience and competence may not be permitted to rely on statements for which the ordinary man might recover, and that one who has acquired expert knowledge concerning the matter dealt with may be required to form his own judgment, rather than take the word of the defendant.
W. Page Keeton et. al., PROSSER and Kee-ton on the Law of Torts § 108, at 751 (5th ed.1984). Furthermore, as Justice Ginsburg, concurring, pointed out, the creditor must prove not only that he “justifiably relied”, but also that the money was “obtained by” (i.e., the loan of money was caused by) the alleged misrepresentation. Field, 516 U.S. at 78, 116 S.Ct. 437 (Ginsburg, J., concurring).
Justifiable reliance is something more than actual reliance, but less than reasonable reliance, depending on the creditor. With respect to the subjective element of justifiable reliance, the Court stated that “the matter seems to turn upon a plaintiffs own capacity and the knowledge which he has or which may fairly be charged against him from the facts within his observation in the light of his. individual case.” Field, 516 U.S. at 72, 116 S.Ct. 437 (citing W. Prosser, Law of Torts § 108, at 717 (4th ed.1971)). In addition, the Court held that “[¿justification is a matter of the qualities and characteristics of the particu *220 lar plaintiff, and the circumstances of the particular case, rather than of the application of a community standard of conduct to all cases.” Id. at 70, 116 S.Ct. 437 (citing Restatement (Second) of Torts § 546A, comment b (1976)).
It is undisputed that, in the present case, AT&T received no direct financial information from Mercer. Rather, AT&T based its decision to issue the pre-ap-proved credit card on a screening formula based on a report of a history of Mercer’s ability to make at least minimum monthly payments on her other credit cards in the past. In doing so, AT&T relied “upon its own judgment and experience as it issuefd] the card and as it determine[d] whether to honor any specific charge made upon the card, and not upon any representation made by the cardholder.” In re Herrig, 217 B.R. 891, 899 (Bankr.N.D.Okl.1998). Thus, in this respect I agree with Judge Duhe and the Bankruptcy Court in In re Ellingsworth that credit card companies assume the risk of issuing pre-approved credit cards on such meager information and thus “cannot justifiably rely on any representation, or absence thereof, made by a card-holder if the card was pre-ap-proved, and no direct financial information was obtained by the issuer.” 212 B.R. 326, 339 (Bankr.W.D.Mo.1997).
However, I do not think that the creditor’s initial assumption of risk necessarily prevents the issuer of a pre-approved credit card from ever justifiably relying on any future representations made by the holder. Rather, I believe that justification may develop over time — for example, as the holder develops a credit history of payments with the specific issuer. This view is based upon section 523(a)(2) as it has been interpreted by the Supreme Court in Field and applied by numerous other courts that have addressed this issue. See, e.g., In re Herrig, 217 B.R. at 900; In re Carrier, 181 B.R. 742, 749 (Bankr.S.D.N.Y.1995); see also In re Foley, 156 B.R. 645 (Bankr.D.N.D.1993) (holding that a series of payments established reasonable reliance); cf. In re Hashemi, 104 F.3d at 1126 (holding that a pre-approved credit card holder made implied representations with each use of the card and that because “appellant himself testified that he had repaid American Express balances of up to $60,000 ‘numerous times’ before ... American Express therefore had no reason to question the good faith of appellant’s promise to repay.”).[1]
Applying the elements of section 523(a)(2) to the undisputed facts in the present case, I conclude that prior to the uninvited issuance of the credit card to Mercer, AT&T did not make a reasonably adequate assessment of her present financial condition so as to warrant considering her mere use of the card as a representation upon which AT&T could justifiably rely.[2] AT&T was not primarily caused to *221 authorize loans by Mercer’s use of the card; on the contrary, AT&T relied primarily on a prediction of a “risk score” based on impersonal credit bureau credit history information — Mercer’s “risk score” was 735 on a scale of 900, not far above AT&T’s minimum score of 680. There was nothing in AT&T’s brief experience with Mercer as a cardholder that would justify its belief that it had acquired a more substantial basis for its reliance upon her representations than it started out with, to wit: (1) fourteen of Mercer’s transactions were cash loans, several of which were made within a casino;[3] (2) Mercer borrowed the maximum cash advance amount within thirty one days after receipt of the card; (3) Mercer had developed no history of payment or good standing with the issuer (Mercer had only made one payment of $25); (4) nineteen days after issuance, the issuer’s own computer had red-flagged the use of Mercer’s credit card for excessive transactions. “[Tjaking [the] qualities and characteristics of the particular plaintiff, and the circumstances of the particular case” as a whole, AT&T as a sophisticated financial actor did not satisfy its burden to prove that it had developed justifiable reliance upon any representation by her before or after the issuance of the pre-approved credit card, thus reducing the probability of any actual rebanee by AT&T on any such representations. Field, 516 U.S. at 71-76, 116 S.Ct. 437.[4]
The undisputed evidence shows that (1) AT&T approved Mercer’s loans and made the cash accessible to her prior to any implied representations made by her to repay the loans through the use of the credit card; (2) AT&T most likely did not actually rely on Mercer’s card-use representations before it authorized her ATM loans; (3) any actual reliance by AT&T, as a sophisticated financial actor, on the mere use of the card was not justifiable because AT&T issued the card based on impersonal credit bureau credit history and credit “risk score” predictors, which included no information as to Mercer’s current financial condition, solvency or ability to repay the loans contemplated; (4) nothing in Mercer’s use of the card after issuance did anything to justify AT&T’s reliance on Mercer’s implied by card use representations.
There is no doubt that AT&T made credit card loans to Mercer that she was legally obligated to pay but did not. This is not a suit on that contract or debt, however. Under section 523 of the Bankruptcy Code, to deny Mercer a discharge AT&T was required to prove that Mercer knowingly made false representations, which AT&T actually and justifiably relied upon, and which caused AT&T to lend her the money. The evidence is clear and undisputed that AT&T failed to prove that it actually relied upon, much less justifiably relied upon, any representation by Mercer that caused AT&T to make the credit card loans available to Mercer. Accordingly, because AT&T manifestly failed to prove all of the elements of fraud required by law, I join in affirming the judgment of the bankruptcy court.

. The partial quotation from In re Anastas, 94 F.3d at 1286, that Judge Barksdale borrows as his standard is not a complete or comprehensive statement of the Ninth Circuit's jurisprudence on justifiable reliance. The quote in In re Anastas was dicta as that court ruled solely on fraudulent intent and not on justifiable reliance. See id. at 1287. Further, the court in In re Anastas cited In re Eashai for this test, a case in which the cardholder had established a history of payments with the specific creditor at issue. See Citibank (South Dakota) N.A. v. Eashai (In re Eashai), 87 F.3d 1082, 1090-92 (9th Cir.1996). If Mercer had, as in In re Eashai, developed a credit history with AT&T without any red-flags, AT&T's reliance may arguably have been justifiable. See also In re Hashemi, 104 F.3d at 1126; AT&T Universal Card Services v. Burdge (In re Burdge), 198 B.R. 773, 778 (B.A.P. 9th Cir.1996) (“In the past, Burdge had a good payment record [with AT&T], which demonstrated a responsible use of the charge card.”); F.C.C. National Bank v. Cacciatore (In re Cacciatore), 209 B.R. 609 (Bankr.E.D.N.Y.1997); AT&T Universal Card Services Corp. v. Feld (In re Feld), 203 B.R. 360 (Bankr.E.D.Pa.1996).

. Judge Barksdale correctly points out that AT&T did have a credit bureau screening process designed to assess her "risk score” according to indices of her credit history, but it is undisputed that AT&T did not have any information as to Mercer's financial condition or ability to pay at the time it issued the card, i.e., to what extent her current debt levels exceeded her net worth and future income.

. At trial, AT&T's representative conceded that AT&T considers the location of charges and cash withdrawals in determining whether such charges should be a source of concern. For example, he conceded that charges made at casinos (presumably for gambling) would raise more of a concern than charges for food, shelter, or clothing and that charges made in a high-crime area could possibly be a cause for concern.

. By listing the specific factors present in this particular case, I am not indicating (as Judge Barksdale suggests) that, inter alia, credit card companies must cancel cards used frequently within the first billing cycle or that credit card companies may never approve cash withdrawals from a casino. I find not that these factors caused AT&T’s reliance to be unjustified, but rather that they do not make AT&T's otherwise unjustified reliance justifiable.