FILED

JUN 24 2015

SUSAN M. SPRAUL, CLERK
U.S. BKCY. APP. PANEL
OF THE NINTH CIRCUIT

**NOT FOR PUBLICATION**

**UNITED STATES BANKRUPTCY APPELLATE PANEL**

**OF THE NINTH CIRCUIT**

| | |
|---|---|
| In re: ) | BAP No.   CC-14-1363-KuDTa |
| ) | |
| GEORGE CHIKE IFEORAH, ) | Bk. No.   12-15356 |
| ) | |
| Debtor. ) | Adv. No.   13-01048 |
| _____ ) | |
| GEORGE CHIKE IFEORAH, ) | |
| ) | |
| Appellant, ) | |
| ) | |
| v. ) | **MEMORANDUM**[*] |
| ) | |
| RYAN FLEGAL; INVEST & DESIGN, ) | |
| LLC, ) | |
| ) | |
| Appellees. ) | |
| _____ ) | |

Argued and Submitted on June 18, 2015
at Pasadena, California

Filed – June 24, 2015

Appeal from the United States Bankruptcy Court
for the Central District of California

Honorable Mark S. Wallace, Bankruptcy Judge, Presiding

Appearances:     Andrew Edward Smyth argued for appellant George Chike Ifeorah; Mark M. Sharf of Merritt, Hagen & Sharf LLP argued for appellees Ryan Flegal and Invest & Design, LLC.

Before: KURTZ, DUNN and TAYLOR, Bankruptcy Judges.

---

[*]This disposition is not appropriate for publication. Although it may be cited for whatever persuasive value it may have (see Fed. R. App. P. 32.1), it has no precedential value. See 9th Cir. BAP Rule 8024-1.

**INTRODUCTION**

George Ifeorah appeals from a judgment under 11 U.S.C. § 523(a)(2)(A)[1] excepting from discharge his debt to Ryan Flegal and Invest & Design LLC.[2] Ifeorah offers several different reasons why he believes the court erred in making its § 523(a)(2)(A) ruling. In fact, Ifeorah challenges on appeal virtually every element necessary to determine a debt nondischargeable under § 523(a)(2)(A). Most of Ifeorah's arguments are devoid of merit. While his arguments regarding the measure of damages are at least plausible, in the final analysis we are not persuaded that the bankruptcy court incorrectly determined the measure of damages flowing from Ifeorah's fraud. Accordingly, we AFFIRM.

**FACTS**

In December 2003, Ifeorah and Flegal entered into a ten-year lease covering commercial real property located in Inglewood, California. Formerly, a fitness club was operated there, but Ifeorah wanted to open a fine dining restaurant, where the public could come to listen to music while having food and drinks. Thus, upon commencement of the lease, Ifeorah and his business partner Vera McCraw undertook, with Flegal's knowledge and consent, major tenant alterations and improvements that were both costly and time consuming.

---

[1]Unless specified otherwise, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532, and all "Rule" references are to the Federal Rules of Bankruptcy Procedure, Rules 1001-9037.

[2]In this decision, we jointly refer to Flegal and Invest & Design LLC as Flegal.

The restaurant did not open for business until May 2005. By that time, Ifeorah and McCraw had paid for and installed a modern commercial kitchen with a full array of expensive kitchen equipment. In addition to the high-end kitchen equipment, Ifeorah and McCraw also purchased and installed in the restaurant dining areas and restrooms a number of crystal and polished brass chandeliers. Ifeorah and McGraw spent in excess of $200,000 on these improvements and equipment.

After entering into the lease but before the restaurant opened for business, Ifeorah and McCraw formed a Nevada corporation known as Oasis Restaurant, Inc., with Ifeorah holding a 60% interest and McCraw holding a 40% interest. They transferred ownership of all of the personal property purchased for the restaurant to the corporation.

For a year or two, the restaurant did reasonably well, and Ifeorah timely paid the rent due under the lease. However, beginning in August 2007, Ifeorah defaulted on his lease payments. Ifeorah thereafter made some lease payments from time to time, but never managed to get current on his rental obligations. Consequently, in May 2008, Flegal commenced an unlawful detainer proceeding to recover possession of the property. In June 2008, on the day of the unlawful detainer trial, the trial judge directed the parties to discuss settlement in the courthouse hallway, and the parties were able to reach an agreement, which they memorialized in a written settlement agreement.

Under the settlement agreement, Ifeorah agreed to pay $8,000 immediately to Flegal, of which $7,000 was applied to accrued

3

late fees and interest and $1,000 was applied to past-due rent. Flegal in turn agreed to permit Ifeorah to retain occupancy of the rental property, provided that Ifeorah timely made the lease payments according to the lease payment schedule set forth in the settlement agreement. That schedule permitted Ifeorah to defer a portion of his monthly rental payments during the second half of 2008, with rental payments returning to the original lease amount in January 2009. All deferred rent (including both the rent deferred during the second half of 2008 and the $32,700 in rent accrued but unpaid at the time of the settlement) was due on or before June 30, 2009. If all amounts set forth in the settlement agreement were timely paid, then the settlement would terminate by its own terms and all of the original lease terms would be deemed reinstated. However, if Ifeorah defaulted on the payments provided for in the settlement, then Ifeorah agreed to voluntarily surrender possession of the real property without Flegal having to incur the time and expense of further unlawful detainer proceedings.

In exchange for Ifeorah's retention of possession, the principal benefit Flegal anticipated from the settlement was Ifeorah's promise, if he moved out, to leave in place a "turn-key kitchen facility," which promise was set forth in the settlement as follows:

> If Tenant does move out, tenant will leave a turn-key operational commercial kitchen facility. This includes all kitchen equipment. Tenant may still sell the business to a third party subject to approval by the Lessor and provided Lessor is paid the total balance owed. This paragraph will no longer apply if Tenant pays the full balance owed to Lessor by June 30, 2009.

4

Settlement Agreement (June 23, 2008) at ¶ 5.[3]

In turn, in order to assure Flegal that he had received the promise regarding the kitchen equipment from the right party – the owner of the equipment – the settlement agreement further provided:

> Tenant warrants that Tenant is the owner of all of the above mentioned fixtures and equipment (as mentioned in paragraph 5) and that there are no liens or leases for any of these items. Tenant agrees not to sell, transfer or lease any of this existing equipment without the prior written approval from the Lessor. This paragraph will no longer apply if Tenant pays the full balance owed to Lessor by June 30, 2009.

Settlement Agreement (June 23, 2008) at ¶ 7. Ifeorah obviously knew and understood the contents of this warranty and its relationship to paragraph 5 of the settlement; his initials appeared next to a one-word interlineation excising the word "furniture" from the warranty.

Ifeorah timely made all of his monthly lease payments, as adjusted by the settlement agreement, except for the balloon payment in the amount of $41,520 due on June 30, 2009. After Ifeorah defaulted on the $41,520 payment, he from time to time made some lease payments, but he never managed at any time thereafter to cure his June 2009 default or to timely make all of his rental payments due under the lease. Nonetheless, Ifeorah never voluntarily moved out of the restaurant property, nor did Flegal commence a new unlawful detainer proceeding until February 2012. Flegal's delay in seeking possession of the rental

---

[3]There is no dispute that Ifeorah was referred to as the tenant in the settlement agreement.

5

property apparently was due in part to the two bankruptcy cases Ifeorah commenced in 2009, in part to the irregular lease payments Ifeorah made from time to time, and in part to negotiations with a third party named Marsha Tekeste, who expressed an interest in buying Ifeorah's and McCraw's restaurant business and/or in renting the property from Flegal. Both of Ifeorah's 2009 bankruptcy cases were dismissed.

In April 2012, Ifeorah filed his third bankruptcy case – a chapter 11 case – which he voluntarily converted to chapter 7 in November 2012. In turn, Flegal obtained relief from stay in August 2012 to pursue his state court remedies, filed a new unlawful detainer proceeding in October 2012, and obtained an unlawful detainer judgment in December 2012.

Under threat of eviction by the Los Angeles County Sheriff's Office, Ifeorah finally surrendered possession of the rental property at the end of December 2012. However, before surrendering the premises, Ifeorah hired contractors, trucks and machinery to strip most of the kitchen equipment from the rental property. In addition to the kitchen equipment, Ifeorah removed the chandeliers and certain other fixtures from the rental property, in violation of the settlement agreement, the lease or both. When Flegal discovered that Ifeorah was attempting to remove all of these items from the premises, Flegal contacted the Inglewood Police Department. But the police refused to intervene, concluding that the disagreement between Flegal and Ifeorah was a landlord-tenant dispute and hence a civil rather than a criminal matter.

After recovering possession of the rental property, Flegal

did not succeed in re-renting the property until May 2013. Marsha Tekeste had for some time expressed an interest in renting the premises from Flegal; however, in light of the condition of the leasehold upon Ifeorah vacating the premises, Flegal was forced to re-negotiate his agreement with Tekeste because their initial agreement contemplated Tekeste's use and enjoyment of a turn-key commercial kitchen facility. After making several significant monetary concessions in Tekeste's favor, Flegal reached a new agreement with Tekeste, and Tekeste took possession of the premises.

In February 2013, Flegal commenced an adversary proceeding against Ifeorah objecting to his discharge under § 727 and seeking to except from discharge under § 523(a)(2) and (6) the debt Ifeorah owed to Flegal. In relevant part, Flegal alleged that Ifeorah knowingly and intentionally deceived Flegal by misrepresenting in the settlement agreement that he (Ifeorah) owned the equipment when in reality Oasis Restaurant, Inc. owned the equipment. In addition to this misrepresentation, Flegal further alleged that Ifeorah falsely promised that, if he moved out, he would leave a turn-key commercial kitchen facility. According to Flegal, Ifeorah never intended to honor this promise; he only made this promise to fraudulently induce Flegal to enter into the settlement agreement.

After a trial on the merits, the bankruptcy court ruled in favor of Flegal on his § 523(a)(2)(A) claim. The court ultimately ruled that, as result of Ifeorah's fraudulent conduct (the false promise regarding retention of the equipment in place and the misrepresentation regarding ownership of the equipment),

7

Flegal was entitled to an exception to discharge judgment in the amount of $268,735.98. This judgment consisted of: (1) $141,722.23 in accrued but unpaid rent, including interest at the lease rate of 10%; (2) $51,555.00, which represented the fair market value of the equipment he was supposed to have received under the settlement agreement; (3) punitive damages of $25,000; and (4) attorney's fees of $50,458.75.[4] The court later entered an amended judgment dismissing Flegal's other claims for relief, but leaving undisturbed the judgment in favor of Flegal under § 523(a)(2)(A).

Ifeorah timely filed his notice of appeal.

## JURISDICTION

The bankruptcy court had jurisdiction pursuant to 28 U.S.C. §§ 1334 and 157(b)(2)(I) and (J). We have jurisdiction under 28 U.S.C. § 158.

## ISSUE

Did the bankruptcy court correctly determine that Ifeorah's indebtedness to Flegal was nondischargeable under § 523(a)(2)(A)?

## STANDARDS OF REVIEW

We review de novo the bankruptcy court's legal conclusions, and we review for clear error its factual findings as to whether the requisite nondischargeability elements are present. Tallant

---

[4]Ifeorah did not challenge in his opening appeal brief the punitive damages award, the attorney's fees award, or the accrual of interest at the lease rate. Accordingly, we will not further discuss these aspects of the bankruptcy court's damages award. See Christian Legal Soc'y v. Wu, 626 F.3d 483, 487–88 (9th Cir. 2010) ("We review only issues [that] are argued specifically and distinctly in a party's opening brief."); Brownfield v. City of Yakima, 612 F.3d 1140, 1149 n.4 (9th Cir. 2010) (same).

v. Kaufman (In re Tallant), 218 B.R. 58, 63 (9th Cir. BAP 1998). Findings of fact are clearly erroneous only if they are illogical, implausible, or without support in the record. Retz v. Samson (In re Retz), 606 F.3d 1189, 1196 (9th Cir. 2010).

**DISCUSSION**

To except a debt from discharge under § 523(a)(2)(A), a creditor must prove by a preponderance of the evidence the following elements:

(1) the debtor made . . . representations;
(2) that at the time he knew they were false;
(3) that he made them with the intention and purpose of deceiving the creditor;
(4) that the creditor relied on such representations; [and]
(5) that the creditor sustained the alleged loss and damage as the proximate result of the misrepresentations having been made.

Gomeshi v. Sabban (In re Sabban), 600 F.3d 1219, 1222 (9th Cir. 2010)(quoting Am. Express Travel Related Servs. Co. v. Hashemi (In re Hashemi), 104 F.3d 1122, 1125 (9th Cir. 1996)).

Ifeorah contends that his so-called misrepresentation regarding ownership of the kitchen equipment was insignificant and immaterial. Ifeorah insists that there was no material difference between his owning the equipment and Oasis Restaurant, Inc. owning the equipment. We have at least two problems with this argument. First, it ignores the fact that the bankruptcy court also found that Ifeorah made a fraudulent false promise, which is sufficient grounds to support a § 523(a)(2)(A) claim separate and distinct from the misrepresentation regarding ownership of the equipment. See Barrack v. McCrary (In re Barrack), 217 B.R. 598, 606 (9th Cir. BAP 1998) ("A promise made with a positive intent not to perform or without a

9

present intent to perform satisfies § 523(a)(2)(A).") (quoting Rubin v. West (In re Rubin), 875 F.2d 755, 759 (9th Cir. 1989)).

Second, the bankruptcy court found that Ifeorah's deceit regarding the equipment was material. As a matter of California law, we agree with the bankruptcy court that there was a material difference between Ifeorah's property and Oasis Restaurant, Inc.'s property, because the former and the latter were separate and distinct entities. See Communist Party v. 522 Valencia, Inc., 35 Cal. App. 4th 980, 993 (1995). Additionally, as a factual matter, there was ample evidence in the record that led the bankruptcy court to conclude that the representation regarding ownership of the equipment was material and that Flegal justifiably relied on that representation. As the bankruptcy court pointed out, the potential opportunity for Flegal to retain the equipment upon termination of the lease was the key incentive for Flegal to enter into the settlement. Furthermore, Flegal testified that, if he had known that Oasis Restaurant, Inc. owned the equipment, he would not have entered into the settlement agreement unless the corporation had also promised Flegal he could keep the equipment in the event Ifeorah moved out. Under these circumstances, we cannot say that it was illogical, implausible or without support in the record for the bankruptcy court to find that who owned the equipment was material.[5]

---

[5]Ifeorah alternately argues that, because McCraw signed off on the settlement agreement on behalf of herself and Oasis Restaurant, Inc., Flegal received the functional equivalent of Oasis's promise that he could keep the kitchen equipment. However, the settlement agreement explicitly states that McCraw's signature only acknowledged that neither Oasis nor McCraw had or
(continued...)

Ifeorah further contends that it is impossible to logically reconcile the bankruptcy court's finding that Ifeorah intended to pay the rent if he could with its finding of fraud. But Ifeorah's second argument depends on a mischaracterization of what the court found. According to Ifeorah, the bankruptcy court's fraud finding related to his promise to make lease payments. This is simply wrong. As set forth above, Ifeorah's misrepresentation and his false promise both concerned the kitchen equipment and did not directly implicate his promise to pay rent. The court's findings on this point were supported by the record. The court inferred from the time, expense and effort Ifeorah invested in acquiring the kitchen equipment that Ifeorah cared too much for the equipment to not realize that Oasis Restaurant, Inc. held title to the equipment. The court further inferred from these same facts that Ifeorah's knowing misrepresentation regarding ownership of the equipment dovetailed with an intent, at the time Ifeorah made the promise regarding the equipment, never to honor that promise. The bankruptcy court's fraudulent intent finding also is supported by the time, money and effort Ifeorah invested in removing nearly all of the kitchen equipment as well as some items that doubtlessly qualified as fixtures.

Thus, the bankruptcy court's findings that Ifeorah knowingly misrepresented his ownership of the equipment and falsely

---

[5](...continued)
would make any "claim to possession of the property" – clearly referring to the rental property and not the equipment. On this record, McCraw's limited acknowledgment is not reasonably susceptible to any other interpretation.

promised that Flegal could retain the equipment were not clearly erroneous.

Ifeorah then challenges the bankruptcy court's finding that Flegal relied on Ifeorah's misrepresentation and false promise to his detriment. In support of this argument, Ifeorah points to Flegal's testimony admitting that he **would not** have refused to enter into the settlement if he had known that Oasis Restaurant, Inc. (instead of Ifeorah) held title to the equipment. Notwithstanding this admission, Flegal's testimony as a whole supports the bankruptcy court's reliance finding. Flegal explained that, if Ifeorah had not misrepresented who owned the equipment, Flegal would have insisted on having as part of the settlement Oasis Restaurant, Inc.'s promise that Flegal could retain the equipment in the event Ifeorah moved out. The court also pointed out that Ifeorah's promise to leave in place a turn-key commercial kitchen facility was the most significant benefit Flegal was supposed to receive under the settlement. Therefore, on this record, the bankruptcy court did not clearly err when it inferred that, if Flegal had known the true state of affairs (that Ifeorah had no intention of ever surrendering the equipment), Flegal would not have entered into the settlement.

Ifeorah next contends that his fraud did not proximately result in any damages to Flegal. In support of his proximate cause argument, Ifeorah posits that Flegal needed to show that he had valuable collection remedies at the time the parties entered into the settlement and that these collection remedies diminished in value after the settlement agreement was entered into. Ifeorah relies in part on Hung Bank v. Kim (In re Kim), 163 B.R.

12

157, 161 (9th Cir. BAP 1994), aff'd & adopted, 62 F.3d 1511 (9th Cir. 1995). In turn, In re Kim relied upon Siriani v. Nw. Nat'l Ins. Co. (In re Siriani), 967 F.2d 302, 305 (9th Cir. 1992).

Ifeorah's reliance on In re Kim (and derivatively on In re Siriani) is misplaced. Both In re Kim and In re Siriani stand for the general proposition that, when a lender renews or extends the term of a loan for an additional period of time **but does not part with anything else of value on account of the debtor's fraud**, the lender must establish proximate cause by showing it had valuable collection remedies that lost value during the course of the loan extension. Unlike the lenders in In re Kim and In re Siriani, Flegal here was fraudulently induced to enter into a settlement agreement pursuant to which he incurred a significant detriment: he agreed to forego his right to immediate possession of his rental property even though Ifeorah at the time had defaulted on rental payments in excess of $30,000. Had Flegal not entered into the settlement agreement, he could have recovered the premises at that time and thereby would have avoided the accrual and nonpayment of tens of thousands of dollars in additional rent payments. This is more than sufficient to satisfy the proximate cause requirement.

Ifeorah also contends that the bankruptcy court erroneously awarded Flegal benefit-of-the-bargain damages. We agree with Ifeorah that the appropriate measure of damages should be determined by reference to state law and that Flegal is entitled to a discharge exception covering all damages flowing from the fraud. See In re Sabban, 600 F.3d at 1222-24 (citing Cohen v. de la Cruz, 523 U.S. 213, 223 (1998)). We also note that our task

13

in construing California law is to follow the decisions of the California Supreme Court or, alternately, if that court has not yet decided the issue, to predict how the California Supreme Court would decide it. See Vestar Dev. II, LLC v. Gen. Dynamics Corp., 249 F.3d 958, 960 (9th Cir. 2001).

According to Ifeorah, California law permits fraud victims to recover in civil actions "out of pocket losses," but does not permit them to recover the "benefit of the bargain." Aplt. Opn. Br. at p. 28 (citing Lazar v. Super. Ct., 12 Cal. 4th 631 (1996)). We are perplexed by Ifeorah's citation to Lazar. The California Supreme court explicitly stated in Lazar that, in appropriate cases, "fraud plaintiffs may recover 'out-of-pocket' damages **in addition to benefit-of-the-bargain damages**." Id. at 646 (emphasis added). The principal issue addressed by the California Supreme Court in Lazar was "whether [it] should restrict [on policy grounds] the availability of traditional tort remedies when they are sought in the employment context." Id. at 644. The Lazar court answered this question in the negative, in the process reasoning that there was no compelling policy reason to restrict a defrauded employee from recovering the full array of compensatory damages which, according to the Lazar court, potentially included both benefit-of-the-bargain damages as well as out-of-pocket damages. Id. at 645-46; see also Persson v. Smart Inventions, Inc., 125 Cal. App. 4th 1141, 1154-55 (2005) (holding that fraud plaintiff may retain the benefits of the contract he or she was fraudulently induced to enter into and at the same time sue for damages for the loss suffered as a result of the fraud); Denevi v. LGCC, 121 Cal. App. 4th 1211, 1220

14

(2004) (same).

We acknowledge that the California legislature generally has barred fraud plaintiffs from recovering benefit-of-the-bargain damages when the subject contract is a contract for the purchase, sale or exchange of property. See Cal. Civ. Code § 3343(a)(1). Thus, generally speaking, plaintiffs fraudulently induced to enter into property transactions only may recover as the measure of their damages, the difference in value between what they parted with and what they received (also known as out-of-pocket losses). See Fragale v. Faulkner, 110 Cal. App. 4th 229, 236 (2003). They typically cannot recover the difference in value between what they actually received and what they were fraudulently led to believe they would receive (also known as benefit-of-the-bargain damages). Id.[6]

However, Ifeorah has offered no argument explaining why we should predict that the California Supreme Court would apply Cal. Civ. Code § 3343 to his settlement agreement with Flegal. Nor are we independently aware of any reason why we should make such a prediction. To the contrary, settlement agreements appear to be beyond the scope of § 3343. See generally Northridge Homeowners Ass'n v. State Farm Fire & Cas. Co., 50 Cal. 4th 913, 926 (2010) (determining proper measure of damages for fraudulent inducement to enter into settlement agreement without any

_____

[6]We use the terms "typically" and "generally" because there are a number of exceptions to the limitation set forth in the statute. Some of those exceptions are set forth in the statute itself (see, e.g., § 3343(a)(3), (4)), while others are judge-made exceptions. See Fragale, 110 Cal. App. 4th at 236.

15

reference or citation to Cal. Civ. Code § 3343).[7]

Ifeorah alternately argues that, even if Flegal is permitted to recover benefit-of-the-bargain damages, the bankruptcy court erred by awarding Flegal a combination of both out-of-pocket damages and benefit-of-the-bargain damages. Ifeorah asserts that Flegal had a right to accrued rent, or to the kitchen equipment, but not both. In so arguing, Ifeorah mischaracterizes Flegal's entitlements under the settlement agreement. If Ifeorah had not defrauded Flegal, the settlement agreement would have entitled Flegal not only to keep the equipment but also to make a claim for accrued but unpaid rent.

In essence, Ifeorah really is arguing that the bankruptcy court's award of both the value of the equipment and accrued but unpaid rent amounted to a double recovery in Flegal's favor. We agree with Ifeorah that California law prohibits fraud plaintiffs from obtaining a double recovery on account of the defendant's fraud. See Tavaglione v. Billings, 4 Cal. 4th 1150, 1159 (1993) ("Double or duplicative recovery **for the same items of damage** amounts to overcompensation and is therefore prohibited.") (emphasis added). Nonetheless, there is no double recovery when

---

[7]Ifeorah cites to Gen. Leasing Co. v. Anguiano (In re Anguiano), 99 B.R. 436, 437-38 (9th Cir. BAP 1989), for the proposition that fraud plaintiffs cannot recover benefit-of-the-bargain damages in exception to discharge actions. In re Anguiano is inapposite. That case held on general equitable grounds that benefit-of-the-bargain damages were unnecessary to compensate the plaintiff under the specific facts and circumstances of that case. Id. at 438. As we explain in this decision, we reach the opposite conclusion: benefit-of-the-bargain damages were necessary to fully compensate Flegal for his losses.

16

the court awards "separate items of compensable damage . . . shown by distinct and independent evidence." Id.

We perceive no double recovery here. The record shows that, but for Ifeorah's fraud, accrued but unpaid rent would not have swollen from $33,700 at the time of the settlement to $164,514.62 (including interest) by the time Marsha Tekeste began paying rent in May 2013. In addition, between the time Tekeste's lease began in 2013 and the resolution of Flegal's adversary proceeding in 2014, at least another $16,000 in interest would have accrued, thereby bringing the grand total of accrued but unpaid rent (including interest) to roughly $180,000 by the time Flegal obtained his nondischargeability judgment in July 2014. Even if we were to subtract from the $180,000 grand total the $33,700 already due at the time of the settlement (which Flegal presumably did not incur as a result of fraud), the record more than amply supported the bankruptcy court's award of rent (including interest) in the amount of $141,722.23.

The record indicates that the bankruptcy court calculated Flegal's rent and interest-related damages in a different manner. Essentially, the court relied on Flegal's calculations. Even so, because our calculations lead to a slightly higher amount of damages, any error of the bankruptcy court in calculating the amount of this item of damages was harmless from Ifeorah's perspective. We must ignore harmless error. Litton Loan Serv'g, LP v. Garvida (In re Garvida), 347 B.R. 697, 704 (9th Cir. BAP 2006).

Meanwhile, as a separate and distinct item of compensable damages, but for Ifeorah's fraud, Flegal would have held a

17

contractual entitlement to retain the kitchen equipment. The bankruptcy court calculated the amount of this item of damages as $51,555.00 – an amount equal to the appraised value of the equipment Flegal removed from the premises or, alternately, as roughly equal to the amount of concessions Flegal needed to offer Tekeste during their re-negotiation of her lease after Ifeorah stripped the equipment from the premises. Ifeorah has not demonstrated that the court's calculation of this item of damages was illogical, implausible, or unsupported by the record.

The overarching goal of compensatory tort damages is to make the plaintiff whole. See Strebel v. Brenlar Invs., Inc., 135 Cal. App. 4th 740, 749 (2006) (citing Cal. Civ. Code §§ 1709 & 3333). In order to accomplish this goal, the trial court typically may consider out-of-pocket damages, benefit-of-the-bargain damages and other measures of damages. Id.; see also Lazar, 12 Cal. 4th at 646. In sum, so long as Cal. Civ. Code § 3343 does not apply, a fraud plaintiff may be awarded both out-of-pocket damages and benefit-of-the-bargain damages if both measures of damages are necessary to ensure that the fraud plaintiff is fully compensated for all of his or her separate and distinct losses flowing from the fraud.

The only other argument Ifeorah makes is that Flegal's loss of the equipment resulted from Ifeorah's conversion rather than Ifeorah's fraud. Ifeorah's conversion versus fraud argument fails because it is nothing more than a thinly-disguised attack on the bankruptcy court's proximate cause finding. Suffice it to say that proximate cause is a finding of fact, In re Tallant, 218 B.R. at 63, and that Ifeorah has not presented us with

18

anything that comes close to establishing that the bankruptcy court's proximate cause finding was clearly erroneous. See Anderson v. City of Bessemer City, N.C., 470 U.S. 564, 574 (1985) ("Where there are two permissible views of the evidence, the fact finder's choice between them cannot be clearly erroneous.").

**CONCLUSION**

For the reasons set forth above, we AFFIRM the bankruptcy court's nondischargeability judgment.